**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 13-cv-00055-CMA-BNB

MINGYI ROWE

      Plaintiff,

v.

UNITED AIRLINES, INC.,

      Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

      This matter comes before the Court on Defendant's Motion for Summary Judgment and Memorandum in Support.  (Doc. # 41.)  For the following reasons, the Court grants the motion.

## I.  BACKGROUND[1]

      Plaintiff began working for Defendant as a flight attendant in December 2000.  In 2003, Plaintiff began suffering from migraine headaches.  To treat the condition, Plaintiff lies down and sleeps the migraine off, and sometimes takes prescription migraine medication, which makes her drowsy.  During a migraine Plaintiff cannot work, can walk some, has sensitive vision and hearing, and has trouble speaking logically.  Her migraines are triggered by stress, anxiety, and lack of sleep.

---

[1] The following facts are undisputed, unless otherwise noted. The Court will elaborate, as needed, in its analysis section.

Plaintiff informed Defendant's medical department that she had migraines in order to apply for leave under the Family Medical Leave Act ("FMLA").  Plaintiff's FMLA leave was approved in 2003 and every year from 2005 to 2010.  Plaintiff's last FMLA approval provided her with FMLA leave through November 2011 and allowed for intermittent leave 1 to 4 times a month, for 1 to 3 days each.

In 2007, while employed by Defendant, Plaintiff moved to Colorado and remains domiciled in Colorado.  Following her transfer to Denver in March 2007, Plaintiff took FMLA leave 78 different times: 19 times in 2007; 23 times in 2008; 19 times in 2009; 12 times in 2010; and 5 times in 2011.  While in Colorado, Mark Dodge was Plaintiff's immediate supervisor.  While working out of Denver, Plaintiff received two perfect attendance commendations.

Flight attendants have the privilege of traveling for little to no cost for personal trips provided that there are seats available.  To determine whether seats are available, employees can log onto Defendant's internal flight search system to search for flight times, connections, and check flight "loads."[2]  A flight attendant may place herself on the standby list for a flight at least a week in advance, although such listing does not guarantee a seat on the flight.  In February 2011, a flight attendant could use "coupons" to increase boarding priority and, thus, the likelihood of getting on the flight.  Flight

---

[2] A flight "load" shows how many seats are already booked and how many, if any, are still open. Knowing the load allows a flight attendant to gauge the likelihood of getting a seat on a flight.  If only a few seats are open, the chances of getting on the flight are not good.

attendants may also travel via "jumpseats"[3] if any are available.  To secure a jumpseat, a flight attendant must be at the airport at least 30 minutes before the flight departs to place her name on the list for a jumpseat.  There is no mechanism to check jumpseat availability prior to arriving at the airport.  A flight attendant can also purchase discounted tickets for available seats either on United flights or on other airlines.

In October 2010, Plaintiff and her husband[4] bid for, and were awarded, time off from March 2 through March 27, 2011. Plaintiff had also scheduled time off for February 24, 25, and 26, but was scheduled to work standby reserve February 27-March 1, 2011. In January and February 2011, Plaintiff conducted the following flight searches on Defendant's internal flight search system related to her planned time off:

- January 14: Denver to Taipei on February 22 and 23, returning March 31;

- February 22: Denver Taipei on February 23 and 24, returning April 1; and

- February 23: Denver to Taipei on February 24.

Plaintiff's husband also conducted several flight searches on Defendant's internal flight search system:

- January 16: Denver to Taipei on February 25, 26, and 27;

- February 4: Denver to Taipei on February 24, returning April 2;

- February 19: Denver to Taipei on February 23 and 24, returning April 2 and April 24;

---

[3] "Jumpseats" are the small, fold-down seats working flight attendants use during take-off and landing.

[4] Plaintiff's husband, Emory Rowe, is a current United flight attendant based in Denver.

- February 23: Denver to Taipei on February 24.

On the evening of February 23, Plaintiff received a telephone call from her parents in Taipei, Taiwan telling her that her uncle in Taipei had been taken to the hospital and was close to dying.  That evening Plaintiff and her husband listed to fly to Taipei on February 24 using 6-7 coupons.  Both Plaintiff and her husband were able to get on the flight.  Plaintiff did not list for a flight to return from Taipei for her work assignment on February 27.

Plaintiff arrived in Taipei on February 25, at approximately 11:00 p.m. local time and proceeded to the hospital to visit her ailing uncle.  Sometime after Plaintiff's arrival in Taipei, Plaintiff began to suffer from a migraine headache, which was then exacerbated by visiting her uncle in the hospital.  She took her prescription medication to treat the migraine.

In order to get back for her work assignment on February 27, Plaintiff needed to leave Taipei on February 26 on United's 10:20 am flight.  However, Plaintiff did not purchase a ticket or list for the 10:20 am flight, nor did she check the load to see if any seats were available, nor did she search Defendant's internal flight search system for flights leaving Taipei for Denver on February 26, nor did she purchase tickets on another airline for a return trip.  In addition, Plaintiff did not notify Defendants on February 26 that she would not be returning to Denver for work the following day.  However, on February 26, Plaintiff did visit her uncle in the hospital.

On February 27, the day she was due to work in Denver, Plaintiff called in sick and placed herself on FMLA leave.  She remained on FMLA leave on February 28 and

March 1, and then removed herself from FMLA leave on March 2 to begin her time off.

Plaintiff and her husband spent the entirety of their requested time off in Taipei, Taiwan

and returned to Denver on April 1.

While Plaintiff and her husband were spending their time off in Taipei, Plaintiff's

immediate supervisor, Mr. Dodge checked his queue, which streams data for the flight

attendants he supervises, and noticed that Plaintiff had called in sick.  He pulled up her

monthly schedule, which showed that her sick call immediately preceded a month-long

vacation.  Mr. Dodge then looked to determine whether Plaintiff had traveled anywhere

around that time period, and saw that she had flown to Taipei.  He felt that these

circumstances warranted further investigation, so he requested Plaintiff's Weblist Log

from corporate security.  Plaintiff's Weblist Log showed all of the flight searches Plaintiff

conducted in January and February, as listed above.

Plaintiff, as a flight attendant employed by Defendant, was subject to the terms of

a Collective Bargaining Agreement ("CBA") between Defendant and the Association of

Flight Attendants union ("AFA").  Per the CBA, performance and conduct expectations

for flight attendants are set forth in Defendant's Working Together Guidelines which are

available through Defendant's internal website. The CBA also prohibits Defendant from

contacting flight attendants while they are using their time off.  (Doc. ## 41-4, 41-8.)

Thus, it was not until Plaintiff returned to work on April 4 that Mr. Dodge called Plaintiff

and asked to meet with her on April 5 in Denver regarding her sick call and flight to

Taipei.

The April 5 meeting was attended by Mr. Dodge, Maeve Moran (Defendant's witness), Plaintiff, and AFA representative Jaret Beto, who also acted as Plaintiff's witness.  At the meeting Mr. Dodge requested that Plaintiff tell him about her trip to Taipei, her flight record, travel record, work schedule, and search history.  Plaintiff stated that she had a family emergency in Taipei but intended to return for work on February 27.  When asked how she planned to return if she had been unable to get on the February 26, 10:20 am flight, Plaintiff said she did not know.  At the meeting, Mr. Dodge expressed that he did not believe that Plaintiff intended to return for her shift on February 27.  Immediately following the meeting Plaintiff was asked to complete and did complete a flight attendant report describing what was discussed in the meeting, including that she did not have a plan to return to Denver for her shift on February 27.

After the meeting, Mr. Dodge and Defendant's labor relations advisor, Jimmy Chiang, investigated Plaintiff's FMLA leave request history and noticed that Plaintiff had also placed herself on FMLA leave from abroad in October 2009.  Mr. Dodge called another meeting with Plaintiff to inquire about that trip.  That meeting was attended by Mr. Dodge, another United supervisor, Plaintiff, and AFA Denver Chapter President Ken Kyle.  Plaintiff said she did not remember that trip.  At her deposition Plaintiff reported feeling intimidated by Mr. Dodge at both of these meetings because he did not believe her and threatened to issue of Letter of Charge ("LOC") against her.

6

Mr. Dodge then issued Plaintiff a LOC[5] charging that Plaintiff acted inconsistently with Defendant's Working Together Guidelines with respect to Honesty[6] and Professionalism[7] when she falsely claimed illness as the reason she could not work February 27-March 1.

Pursuant to Defendant's regulations, a LOC hearing was conducted before Dean Whittaker[8] on May 31, 2011.  At the LOC hearing, after all the relevant evidence was presented, Mr. Whittaker indicated that he did not believe that Plaintiff was telling the truth when she said she intended to come back to work on February 27.  He stated that he believed Plaintiff was being dishonest when she claimed that her FMLA illness was the reason she did not return for her work assignment on February 27, February 28, and March 1.  Consequently, Mr. Whittaker terminated Plaintiff's employment via a Letter of Discharge on April 25, 2011, explaining that Plaintiff had "acted inconsistently with United Airlines' Working Together Guidelines and with respect to Honesty in that [she] falsely claimed illness as the reason for [her] absence from work on February 27, 28, and March 1, 2011."  The AFA then filed a grievance on Plaintiff's behalf against Defendant.  Plaintiff's termination was reviewed and upheld by an arbitration panel.

---

[5] A LOC triggers a hearing at which a hearing officer would decide whether the employee should be disciplined and, if discipline was warranted, what type of discipline it would impose.

[6] The relevant portion provides:  "Honesty: Be truthful in all communications, whether oral, written or electronic."  (Doc. # 41, ex. 4, 8).

[7] At the time of the LOC, the Working Together Guidelines were new, having recently replaced the Articles of Conduct.  The AFA objected to the lack of specificity in the Professionalism aspect of the charge.  As a result, Defendant issued an amended LOC alleging only a violation of Honesty.

[8] Dean Whittaker was Director of Inflight Services and was Mr. Dodge's supervisor.

## II.  <u>STANDARD OF REVIEW</u>

The purpose of a summary judgment motion is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S 317, 323 (1986).  Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]."  *Anderson*, 477 U.S. at 252.

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323).  After the movant has met its initial burden, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of the claim such that a reasonable jury could find in its favor.  *See Anderson*, 477 U.S. at 248.

8

The nonmovant must go beyond the allegations and denials of her pleadings and provide admissible evidence, which the Court views in the light most favorable to the nonmovant. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Although the nonmoving party need not present evidence "in a form that would be admissible at trial," *Celotex*, 477 U.S. at 324, "the content or substance of the evidence must be admissible." *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995). However, conclusory statements based merely on conjecture, speculation, or subjective beliefs are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F .3d 869, 875 (10th Cir. 2004). Furthermore, "[h]earsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment because 'a third party's description of a witness' supposed testimony is not suitable grist for the summary judgment mill.'" *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (quoting *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998)).

### III. <u>DISCUSSION</u>

Plaintiff's Complaint asserts the following causes of action: (1) interference with the right to take leave under the FMLA; (2) discrimination and retaliation for taking FMLA leave; (3) discrimination in violation of the Americans with Disabilities Act ("ADA"); (4) violation of the Illinois Human Rights Act, 775 ILCS 5/6-101(A) ("IHRA"); and (5) a common law claim of Intentional Infliction of Emotional Distress. (Doc. # 3.) Defendant moves for summary judgment on all of Plaintiff's claims. (Doc. # 41.)

A.    **FMLA CLAIMS**

The FMLA provides, in relevant part, that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D). The Tenth Circuit recognizes two theories of recovery under the FMLA: (1) an interference (or entitlement) theory arising from 29 U.S.C. § 2615(a)(1); and (2) a retaliation (or discrimination) theory arising from 29 U.S.C. § 2615(a)(2).  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006); *see also Brown v. ScriptPro, L.L.C.*, 700 F.3d 1222, 1226 (10th Cir. 2012).

Plaintiff alleges that Defendant interfered with her right to take FMLA leave, and that she was discriminated against and subject to retaliation for taking FMLA leave. (Doc. # 3, ¶¶ 52-62.)  Defendant denies any discrimination or retaliation and moves for summary judgment as to both claims contending that Plaintiff's termination was unrelated to Plaintiff taking FMLA leave. (Doc. # 41.)

Here, the Court determines that Plaintiff's FMLA claims for interference and retaliation fail for the same reason: that Defendant can demonstrate, and Plaintiff cannot refute, that Plaintiff was terminated for violating Defendant's Working Together Guidelines regarding honesty when she used FMLA time for an unauthorized purpose and lied before and during the investigation into her FMLA leave.

Plaintiff's interference claim ultimately fails because Defendant can prove that Plaintiff would have been terminated regardless of her use of FMLA leave.  Essentially,

Defendant did not interfere with Plaintiff's FMLA rights "if dismissal would have occurred regardless of the request for or taking of FMLA leave." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 961 (10th Cir. 2002).  Other jurisdictions have clarified that the "FMLA does not shield an employee from termination simply because the alleged misconduct concerns use of FMLA leave." *See, e.g., Hoffman v. Prof'l Med. Team*, 394 F.3d 414 (6th Cir. 2005) (no FMLA violation where employee was discharged for unprofessional conduct consisting of hostile and profane objections to employer's denial of FMLA leave); *Kitts v. Gen. Tel. N.,* No. 2:04-CV-173, 2005 WL 2277438, at *11 (S.D. Ohio Sept. 19, 2005).  In essence, nothing in the FMLA prohibits an employer from investigating allegations of dishonesty or from terminating an employee who violates company policies governing honesty.[9]

    In the instant case, based on the timing of Plaintiff's travel to Taipei before her scheduled work assignment and calling in her FMLA leave from Taipei, Defendant had reason to believe that Plaintiff may have lied about why she failed to attend her work assignment on February 27.  Plaintiff does not dispute that Defendant was entitled to investigate its suspicions.  These facts, coupled with the flight searches Plaintiff and her husband completed more than a month prior to the hospitalization of her uncle, the lack

_____

[9] Numerous courts have upheld the discharge of employees who lied to cover up their abuse of approved FMLA leave.  *See, e.g., Kaylor v. Fannin Reg'l Hosp. Inc.*, 946 F. Supp. 988 (N.D. Ga. 1996) (overwhelming evidence that employee was discharged for lying and misleading employer about use of FMLA leave); *Agee v. Nw. Airlines, Inc.*, 151 F. Supp. 2d 890 (E.D. Mich. 2001) (employee terminated for falsifying sick leave, lying and failing to cooperate in employer's investigation concerning use of FMLA leave); *Loomis v. Honda of Am. Mfg., Inc.*, No. C2-01-606, 2003 WL 133264 (S.D. Ohio Jan. 6, 2003) (employee terminated for misrepresenting facts, falsifying records concerning her requests for FMLA leave).

of searches related to return flights on February 27 for Plaintiff's work assignment,

Plaintiff's failure to list for the return flight from Taipei, failure to use coupons to get on

the return flight, failure to request a jumpseat, failure to come to the airport in Taipei to

get on the return flight on February 26, and failure to arrange alternative methods to

return to Denver, could all reasonably lead Defendant to conclude that Plaintiff's leave

request was not for the proper purpose.  *See LeBoeuf v. N.Y. Univ. Med. Ctr.*, No.

98CIV.0973(JSM), 2000 WL 1863762, at *3 (S.D.N.Y. Dec. 20, 2000) ("Where an

employee is terminated because the employer honestly believed that the employee was

not using the leave period for its intended purpose, an FMLA claim will not lie."); *Connel

v. Hallmark Cards, Inc.*, No. 01-2060-CM, 2002 WL 1461969, at * (D. Kan. June 19,

2002) (employer who discharges employee based on reasonable and honest belief that

employee has been dishonest would not be in violation of the FMLA, even if its

conclusion is mistaken).  Thus, Plaintiff is not shielded from disciplinary action for

dishonesty simply because it concerned FMLA-qualifying leave.

Plaintiff's retaliation claim also fails because Plaintiff cannot refute Defendant's

legitimate, non-retaliatory reason for her termination.  Defendant contends that Plaintiff

was discharged, not for taking time off for a serious health condition, but for violating its

Working Together Guidelines regarding honesty when she used FMLA time for an

unauthorized purpose and lied before and during the investigation into her FMLA leave.

This is a legitimate, non-discriminatory basis for termination.

Plaintiff has also failed to demonstrate that Defendant's stated reasons for her

termination were pretext.  *See Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.

1995) (Plaintiff's FMLA retaliation claim survives summary judgment only if she has produced evidence that would allow a reasonable juror to find that the defendant's non-discriminatory reasons are pretextual or otherwise "unworthy of belief").  She cannot show that Defendant's stated reasons for her termination were pretext because the evidence supports that she did not intend to return for her work assignment on February 27, that she improperly used her FMLA leave, and that she did not provide to Defendant evidence to the contrary.  Plaintiff has admitted that she did not know how she would return to Denver for her work assignment on February 27.  She did not search for return flights, did not list for the February 26 return flight when flying to Taipei, did not go to the airport to secure a seat or a jumpseat, and did not attempt to purchase any kind of return ticket.  Furthermore, Defendant noted that on at least one previous occasion Plaintiff had called in FMLA leave while abroad.  In light of these admissions, no reasonable jury could find that the proffered reasons for her termination have no basis in fact.

Neither can Plaintiff establish that the proffered reasons for her termination did not actually motivate her discharge.  In order to establish pretext in this manner, Plaintiff would have to show that the weight of the circumstantial evidence makes it more likely than not that her use of FMLA leave from February 27 to March 1, 2011, was the determinative factor in her discharge.  However, there is no evidence that Plaintiff's use of FMLA leave factored into the decision to terminate her.  As Mr. Dodge explained, the focus of the investigation which led to Plaintiff's termination was whether Plaintiff had lied about the reason for her February 27 to March 1, 2011 absence.  The fact that the

absence was qualified as FMLA leave is of no moment.   Additionally, it is undisputed

that Plaintiff had applied for and been granted FMLA leave on seventy-eight other

occasions during her employment at United Airlines and had suffered no repercussions

therefor.

Plaintiff has presented no evidence from which a jury could find that she was

terminated simply because she took 3 days of FMLA leave from February 27 to March,

2011.  The facts of this case support Defendant's position that it honestly and in good

faith believed that Plaintiff had lied about the reason for her absence. *See Baugher v.*

*Dekko Heating Techs.*, 92 Fed. Appx. 328 (7th Cir. 2004) (holding that if employer

actually believed that employee had been dishonest, "it is impossible to deem the action

a pretext for discrimination or an episode of retaliation").

Plaintiff has also failed to demonstrate that the proffered reasons for her

termination were insufficient to motivate her discharge.  United's Working Together

Guidelines state that employees will "[b]e truthful in all communications, whether oral,

written or electronic," and also provides that "[f]ailure to comply with any of these

Guidelines may result in disciplinary action up to and including termination of

employment."  (Doc. # 41, ex. 4, 8 & 6).  In other words, company policy expressly

provides for termination for dishonesty.  Furthermore, Plaintiff has offered no evidence

showing that other employees were not fired after engaging in substantially similar

misconduct.  None of the evidence cited by Plaintiff demonstrates that Defendant's

proffered reason for her termination "'[is] so weak, implausible, inconsistent, incoherent,

or contradictory as to support a reasonable inference that [Defendant] did not act for those reasons.'" *Campbell*, 478 F.3d at 1291 (citation omitted).

Plaintiff has failed to present sufficient evidence to create a genuine issue of material fact with respect to her interference and retaliation claims.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's FMLA claims.

## B.   ADA CLAIMS

To establish a case of disability discrimination under the ADA where, as here, there is no direct evidence of discrimination, the plaintiff must first make out a prima facie case of discrimination.  *See Cummings v. Norton*, 393 F.3d 1186, 1189 (10th Cir. 2005).  If the plaintiff meets her prima facie case, the burden shifts to the defendant to articulate a nondiscriminatory reason for its conduct.  *Id.*  If the defendant meets that burden, the burden of production then shifts to the plaintiff to present evidence to show that the defendant's stated reason is pretextual.  *Id.*; *see also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

To establish a prima facie case of discrimination, a plaintiff must show that: (1) she is disabled as defined by the ADA; (2) she was otherwise qualified for the job regardless of the disability; and (3) her employer discriminated against her based on her disability.  *Cummings*, 393 F.3d at 1189; *see also Rakity v. Dillon Cos., Inc.*, 302 F.3d 1152, 1164 (10th Cir. 2002) (discussing elements of prima facie case of discrimination under the ADA).  In the context of summary judgment, the *McDonnell Douglas* framework requires a plaintiff to "raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations."  *Rakity*, 302

15

F.3d at 1164 (quotation omitted).  The Court finds that Plaintiff has not established a prima facie case of disability discrimination because Plaintiff cannot show that Defendant discriminated against her because of her disability.

As discussed above, Plaintiff was terminated, not because of her use of FMLA leave, but because of her violation of Defendant's Working Together Guidelines with respect to Honesty.  This is a legitimate, non-discriminatory reason for Defendant's action.  Plaintiff has also presented no evidence of "disparate treatment."  *See Hysten v. Burlington N. & Santa Fe Railway Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002) (the plaintiff ordinarily satisfies the third factor of the prima facie test by "proof that the employer treated similarly situated employees more favorably.")  In the face of these non-discriminatory reasons, Plaintiff has the burden of identifying evidence to show pretext.  She has presented no evidence to support an argument that any actions were taken against her because of her migraine headaches or that the reasons given by Defendant are pretextual.

Although Plaintiff's Complaint titles the ADA claim "Discrimination under the [ADA]," Plaintiff argues that Defendant "disregard[ed] her disability and approved request for accommodation under the ADA . . . ."  (Doc. # 3 at 16.)  It thus appears that Plaintiff is arguing that Defendant denied her a reasonable accommodation.  However, the undisputed facts show that because Plaintiff was unable to perform her job during episodes of migraine headaches, Defendant granted Plaintiff FMLA leave during those episodes.  In fact, Plaintiff was never denied FMLA leave when she requested it.  Accordingly, she was provided a reasonable accommodation when needed, *i.e.,* she

was granted FMLA leave, and she made no further requests for accommodation.  *See*

*Woodman v. Runyon*, 132 F.3d 1330, 1344 (10th Cir. 1997).  Accordingly, Plaintiff's

disability claim fails because she has not shown that she was denied reasonable

accommodations.

## C.    SUPPLEMENTAL STATE LAW CLAIMS

Defendant has also moved for summary judgment on Plaintiff's remaining state

law claims, including violation of the Illinois Human Rights Act and a common law claim

of Intentional Infliction of Emotional Distress.  However, since the Court grants summary

judgment on Plaintiff's FMLA and ADA claims, it declines to exercise jurisdiction over

Plaintiff's supplemental state law claims.  *See United Mine Workers of Am. v. Gibbs*,

383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (holding that if the federal

claims supporting supplemental jurisdiction are dismissed prior to trial, the state claims

should be dismissed as well); 28 U.S.C. § 1367(c).

## IV. <u>CONCLUSION</u>

For the foregoing reasons, it is ORDERED that Defendant's Motion for Summary

Judgment (Doc. # 41) is GRANTED.  Accordingly, it is

FURTHER ORDERED that Plaintiff's FMLA and ADA claims are DISMISSED

WITH PREJUDICE and the Clerk of the Court shall enter judgment in favor of

Defendant and against Plaintiff.  Pursuant to D.C.Colo.LCivR 54.1, Defendant may

thereafter have its costs by filing a bill of costs within 14 days of the date of that order.

It is

17

FURTHER ORDERED that Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE.  It is

FURTHER ORDERED that the final trial preparation conference, currently scheduled for August 8, 2014, and the three day jury trial, set to begin on August 18, 2014, are VACATED.

DATED:  August 4, 2014

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

18